[598 NYS2d 200]

In the Matter of ARTHUR I. STRIER, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, May 25, 1993

### APPEARANCES OF COUNSEL

*Barbara S. Gillers* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*David Wikstrom* and *Ellis, Funk, Eidman & Benjamin (Howard Benjamin* of counsel), for respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent was admitted to practice by the Second Judicial

Department in 1968, and has maintained an office for the practice of law within the First Department at relevant times since then. He has specialized in civil service disability and pension matters and employment discrimination cases, and has acted as general counsel to a number of civil service unions and organizations.

Respondent had a close friend, Steven Gerstenhaber, who was the owner of Park Plaza Liquors, a retail establishment on University Avenue in the Tremont section of the Bronx, which his family had operated since 1948. Starting around 1980, business began to decline, due to deterioration of the neighborhood, changing demographics, rising crime, and the general economic situation. Across the intersection from Park Plaza Liquors was a competitive establishment, Dan's Liquor Store. Around 1985 the owner of Dan's was killed in an accident, and Gerstenhaber learned that the widow had sold the store to another party who would be applying for a license.

In November 1985 Gerstenhaber told respondent that his business was being threatened by the impending reopening of this competitive liquor store, and that he had reason to believe that the license application was corrupt in that the prospective new owner already owned another liquor store on Amsterdam Avenue. Gerstenhaber also believed that Dan's was in violation of the law because of its proximity to a nearby school. Furthermore, he felt that this devastated neighborhood could no longer support and justify the existence of two liquor stores so close together. The desperate Gerstenhaber asked respondent, as a friend, to see if he could do anything.

It just so happened that six months earlier, respondent had taken on a client, Michael Comperiati, who wished to challenge a Sanitation Department determination denying him a job because of a disqualifying back condition. Respondent was given a $1,500 fee for consultation and initial work on that case. Michael had told respondent that he had had to obtain these funds from his father, Joseph Comperiati, who happened to be the Chief Executive Officer of the New York State Liquor Authority (SLA). Respondent testified as follows before the Hearing Panel: "I told Steven that I had a client whose father was in charge of corruption at the SLA and if I could get the information to him, hopefully it would be of some help." Respondent then did some research and confirmed that his friend's objections to the reopening of Dan's under these

circumstances were legitimate. At that point respondent told Michael that he had "a dear friend" with "a terrible problem", and a meeting was set up at a diner on November 14 to discuss the Gerstenhaber problem, in addition to discussing the status of Michael's case. Respondent asked Michael to take the Gerstenhaber information to his father. Michael agreed to pass the information along that very weekend, either to his father or, if he felt it would be a conflict of interest, to a long-standing friend of his at the State Liquor Authority.

In their discussion of Michael's case, respondent indicated he would need another $1,000 to commence depositions, but when Michael indicated that he did not have that sum available, respondent told him not to worry about having to pay right away. When Michael lamented about his difficulty in meeting Christmas shopping bills, respondent further offered to return $1,000 of the fee already paid, in gratitude for Michael's "trying to help bring this [Gerstenhaber] information to his father." Michael testified that his recollection of the November 14 meeting had respondent stating that "if there was somebody at the State Liquor Authority that had to be taken care of, that wasn't a problem, but he would do that directly through me, that [respondent] did not want to meet or talk to anyone from the State Liquor Authority." This reluctance to have direct contact with anyone at the Authority was repeated to Michael on "numerous occasions".

Michael took this information to his father that very evening, and the two immediately brought the matter to the attention of the New York County District Attorney. There followed seven conversations between Michael and respondent, in person and over the telephone, six of which were recorded by the District Attorney's office. During one of these conversations, on November 20, 1985, respondent indicated to Michael that the standard procedure for challenging a competitor's license would run the challenger $5,000 in legal fees, but he wanted to save his friend that expense. Two days later, Michael told respondent that his contact at the SLA who was responsible for the inspection, and was thus in a position to put a stop on the issuance of the license to Dan's, "needed to be taken care of * * * like one-fifth of what you said that the * * * would have been." Respondent indicated that would be "no problem", that he would "take care of" Michael personally, and then Michael would simply "do what you have to

do". Respondent promised to "make that arrangement * * * over the weekend".

On Sunday, November 24, respondent received $1,000 in cash from Gerstenhaber. His friend had offered to give him a check, but respondent asked for cash for the reason that his client (Michael) needed it for Christmas shopping. (Michael testified that he never said any such thing.) The next day, arrangements were made to deliver to Michael what respondent described on the telephone as "a thousand coupons". That following morning, November 26, Michael visited respondent's office and received an envelope containing $1,000 in $20 bills. In exchange, Michael handed respondent a "Stop Order", indicating a stop had been placed on the application for the license for Dan's. Respondent was not entirely satisfied with this temporary order; he had wanted a final rejection notice, but conceded that at least this would get his friend through the Christmas holiday season without competition in the neighborhood.

The application for a license for Dan's was ultimately rejected on the merits, in that the establishment would not serve public convenience or advantage, a ground upon which a legitimate challenge might have been lodged under standard procedure (see, Alcoholic Beverage Control Law § 63 [6]). This, of course, would not excuse unethical conduct on respondent's part. On the other hand, Gerstenhaber's suggestion that the license application was corrupt because of the applicant's bona fides was untrue, and respondent's attempt to short-circuit the hearing process on the basis of such unsubstantiated innuendo resulted in a denial of due process to the applicant.

In December 1985, an indictment was returned in New York County, charging respondent with bribery in the second degree and attempted official misconduct. He was acquitted of both charges after jury trial. Such an acquittal is not proof of innocence of misconduct, and does not preclude a subsequent proceeding in a civil forum such as this, where the standard of proof is lower (Reed v State of New York, 78 NY2d 1, 7-8; 22 NYCRR 605.9 [b] [2]).

Citing the same course of conduct (i.e., enlisting a client to engage in bribery, and attempted official misconduct), constituting "grave unethical practices and serious professional misconduct", petitioner commenced this proceeding, charging respondent with engaging in illegal conduct involving moral turpitude (in violation of Code of Professional Responsibility

DR 1-102 [A] [3]); conduct involving dishonesty, fraud, deceit or misrepresentation (DR 1-102 [A] [4]); conduct prejudicial to the administration of justice (DR 1-102 [A] [5]); conduct adversely reflecting on the lawyer's fitness to practice law (DR 1-102 [A] [7], formerly DR 1-102 [A] [6]); counselling or assisting a client in conduct that the lawyer knows to be illegal or fraudulent (DR 7-102 [A] [7]); and stating or implying that the lawyer is able to influence a public official improperly or upon irrelevant grounds (DR 9-101 [C]).

A Hearing Panel took testimony and considered the evidence, including character witnesses as to respondent's unblemished record over more than 20 years of practice, and dismissed the first, second, fifth and sixth charges. The third charge (conduct prejudicial to the administration of justice) was sustained by a 2 to 1 vote, and the fourth charge (conduct adversely reflecting on respondent's fitness to practice law) was sustained unanimously. The Panel recommended censure as the appropriate sanction.

Petitioner has moved to modify the Hearing Panel's findings and conclusions, seeking disaffirmance insofar as four counts were dismissed, and seeking a sanction more severe than public censure. Respondent cross-moves to confirm the report and its recommendation of censure.

Even though respondent's initial intention may have been to save his friend (Gerstenhaber) some time and money by finding a shortcut to bring a legitimate objection to the attention of the State Liquor Authority, he quickly crossed the line of legality. Respondent's refusal to meet personally with SLA officials, and his admission to Michael that what they were doing was "questionable", constitute an acknowledgement on his part that he was engaged in conspiratorial conduct that could not withstand the light of day. The fact that an otherwise just result would have been achieved or expedited is not a mitigating factor in this context *(Matter of Goffen*, 103 AD2d 197).

We would prefer that the Hearing Panel had made more specific findings of fact. Nevertheless, after reviewing the record we agree that respondent's conduct did violate the proscriptions of DR 1-102 (A) (5) and (7), as he concedes. Such serious misconduct by an experienced practitioner at the Bar cannot be excused by reason of his "emotional involvement" with a close friend, and deserves more than a mere public censure.

Our reading of this record leads us to the conclusion that respondent was guilty of three of the four other charges rejected by the Panel as well. The second charge must be upheld because respondent dishonestly deceived Gerstenhaber by misrepresenting that he could take care of his friend's problem of threatened competition in the neighborhood by legitimate means, when in fact respondent had an unlawful design. The fifth charge should likewise be upheld because respondent sought to corrupt his youthful client by enlisting him in a scheme to seek special treatment from a public official through the offer of a bribe. Such conduct holds the legal profession up to ridicule, and thus constitutes an act of moral turpitude in the practice of law (charge No. 1). Only in the absence of evidence that Gerstenhaber was aware of his illegal scheme do we confirm the Hearing Panel's dismissal of the sixth charge (professing ability to influence a public official improperly).

The recommendation of the Hearing Panel is confirmed to the extent of upholding the third and fourth charges, and the dismissal of the sixth charge. It is disaffirmed with respect to the Panel's dismissal of the first, second and fifth charges, which we hereby reinstate. Those charges are supported by the evidence in the record. In light of our sustaining of five of the six charges, we hold that the appropriate sanction for such misconduct is disbarment from the practice of law. Respondent's name should be stricken from the roll of attorneys authorized to practice in this State.

ROSENBERGER, J. P., ELLERIN, WALLACH, ROSS and KASSAL, JJ., concur.

Respondent is disbarred from practice as an attorney and counselor-at-law in the State of New York, and his name is directed to be struck from the roll of attorneys and counselors-at-law in the State of New York, effective May 25, 1993.